# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| SUSAN BALDWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 03-B-2621-S |
| | ) | |
| BLUE CROSS, BLUE SHIELD OF | ) | |
| ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiff's Motion for Partial Summary Judgment, (doc. 14), and defendant's Motion for Summary Judgment, (doc. 12). Plaintiff Susan Baldwin has sued her former employer, defendant Blue Cross, Blue Shield of Alabama, alleging that her supervisor, Scott Head, sexually harassed her and that defendant retaliated against her for complaining about discrimination, in violation of federal law. Plaintiff also alleges state-law causes of action for invasion of privacy, intentional infliction of emotional distress, and negligent and/or malicious retention, supervision, and training. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Partial Summary Judgment, (doc. 14), is due to be denied, and defendant's Motion for Summary Judgment, (doc. 12), is due to be granted.

# I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. <u>STATEMENT OF FACTS</u>[1]

Plaintiff began working for defendant on August 28, 1989, in the position of Management Candidate. (Doc. 13, Ex. A at 34 and ex. 8 at 411.) Plaintiff worked in various management positions until April 1998, when she became a Marketing Representative in defendant's Huntsville office. (*Id.* at 34-35, 45.) Marketing Representatives are responsible for selling insurance to employers with up to 499 employees. (*Id.* at 52-53; 127-28.) Sales to employers with 500 or more employees are handled by Account Executives. (*Id.* at 53.) Plaintiff routinely ranked high in the state-wide ranking of total contracts sold by defendant's Marketing Representatives. (*See* doc. 15, Ex. 5.) She also received favorable performance appraisals as a Marketing Representative, receiving scores of 86/100 for 1998, 90/100 for 1999, and 92/100 for 2000. (Doc. 13, Ex. A, exs. 8, 9, and 12.)

In 1998, Tommy Hudgins was defendant's District Manager in Huntsville, and he selected plaintiff for the Marketing Representative position. (Doc. 13, Ex. A at 45.) He remained District Manager of the Huntsville office until November 2000, when defendant promoted him to Vice President of Sales. (Doc. 13, Ex. F ¶ 1; *id.*, Ex. I at 27-28.) Defendant promoted Scott Head from Marketing Representative to District Manager of the Huntsville office to replace Hudgins. (Doc. 13, Ex. A at 62; *id.*, Ex. F ¶ 1.)

---

[1]For purposes of the Motion for Summary Judgment, all disputed facts and reasonable inferences therefrom have been drawn in favor of the plaintiff.

Soon after Head was promoted to District Manager, plaintiff stopped by his office to offer him her congratulations.  (Doc. 13, Ex. A at 82-83.)  Head told plaintiff to "sit down." (*Id.*)  At that time, Head asked plaintiff, "Hey, Babe, are you on my team?"[2]  (*Id.* at 83.) Plaintiff told him that she thought "everybody in [the office] was on [his] team.  (*Id.*)  Head responded, "That's not the fucking question."[3]  (*Id.*)  She told Vince Lindsey, Marketing Representative, about this incident.  (*Id.* at 87-88.)  She alleges Lindsey told her that Head was a "control freak" and that plaintiff "needed to watch her back."  (*Id.* at 88.)  Despite this incident, plaintiff testified that Head had performed his job "very professionally" and she had not felt "threatened in any way" by Head from November 2000 until July 26, 2001.  (*Id.* at 93-95.)

On July 26, 2001, Head, plaintiff, and other employees from the Huntsville office attended a business dinner at a Birmingham hotel.  (*Id.* at 104-06.)  During dinner, Head said to plaintiff, "I've got a room here tonight.  Why don't you just stay down here and party with me?  You know, you don't ever have any fun."[4]  (*Id.* at 113.)  He told her, "We will go dancing and have a few drinks.  You can stay in my room.  I'm safe.  No one will ever

---

[2]Plaintiff testified Head referred to the female employees in the Huntsville office, including plaintiff, as "Babe".  (Doc. 13, Ex. A at 86.)

[3]Head denies using "the 'f' word" at work.  (Doc. 13, Ex. E at 48.)

[4]Head testified that he asked all of the Huntsville attendees to stay over in Birmingham.  (Doc. 13, Ex. E at 39-40, 43.)

know."  (*Id.*)  Plaintiff declined Head's offer to stay in Birmingham and returned to Huntsville after dinner.  (*Id.*)

    While she was driving back to Huntsville, plaintiff received a call from Head.[5]  (*Id.* at 117.)  According to plaintiff, Head asked her to leave her garage door open and told her that he would come by and pick her up.  (*Id.* at 117-18.)  He suggested that they cruise around and have a good time.  (*Id.*)  Plaintiff declined Head's offer.  (*Id.* at 119.)

    A few days following the Birmingham dinner, Head called plaintiff into his office.  (*Id.* at 119.)  Plaintiff's notes of the incident state:

> Scott call[ed] me into his office, close[d] the door and bow[ed] up next to me and [said], "Hey Babe, Blow me."  I [fell] back into the couch as there [was] no where else to go.  Now [I was] really backed into a corner.  I [was] scared to tell Scott how I really [felt] as [I was] concerned again that [he would] consider me to "Not be on the team."

(*Id.*, ex. 13 at Bates no.18.)  Plaintiff testified that she asked Head if there was something else he needed.  (*Id.* at 120.)  To which Head answered, "No."  (*Id.* at 121.)  At this point, plaintiff did not leave Head's office; rather, she testified, "So I got off of the couch and I went to his desk.  There were two chairs in front of his desk and I got into the M&M jar and I got a couple of M&M's and I sat down."  (*Id.*)  When she sat down, Head asked plaintiff

---

[5]Plaintiff testified that Head called her three times and told her that he was following her home and, later, that he was actually at her house.  (Doc. 13, Ex. A at 117-19 and ex. 13 at Bates no.17.)   Head contends he made only one call to check on plaintiff because he believed she was despondent.  (Doc. 13, Ex. F ¶ 3.)

about her weekend and she, in response, asked him about his weekend.  (*Id.* at 121-22.)  She testified:

> I said, What did you do this weekend Scott?  You know, I wanted to seem interested, and at that point, he said, Well, you know, we went out partying this weekend and he says that fucking bitch wife of mine . . . she got so tanked and we got home and she came pretty unglued and she came at me. And he said, I threw that fucking bitch on the floor.
>
> And I was like, What?  He said, Yeah, and I got my hands around her neck.  I said, You did what?  And he said, Yeah, and ***then I realized, I've got to get out of here***.  I said,  . . . Where did you go, Scott?  . . .  He said, I went to Ellen's house.  I said, you went to your ex-wife's house?  He said,  . . . Oh, yeah, . . . she is out of town for the weekend, so I just spent the night there.
>
> ***And at that point, I realized that I was dealing with somebody who just wasn't quite right***.

(*Id.* at 122-23 (emphasis added).)

In addition to these two alleged proposals for sex, plaintiff contends that Head subjected her to an almost continuous harassing conduct, including the following:

(1)   Head regularly said "fuck" or "fucking" and on occasion, "mother-fucker";

(2)   Head regularly called Marketing Representatives "Cocksuckers" or "Peckerwood";[6]

---

[6]The court notes that "peckerwood" is commonly understood as a poor or rural Southern white person; it is not a sexual epithet.  The Online Etymology Dictionary states, "*Peckerwood* (1859) is U.S. Southern black dialectal inversion of woodpecker (q.v.); in folklore, taken as the type of white folks (1929) and symbolically contrasted with blackbird." <<http//www.etymonline.com/index.php?1=p&p=8>>   Similarly, the Anti-Defamation League notes the history of the term as follows:

Southern blacks used "peckerwood" as a derogatory term to describe poor

(3) Head said "bullshit" on numerous occasions;

(4) Head referred to women as "sluts", "tramps", and "bitches" on a regular basis;

(5) Twice Head played with his zipper in front of plaintiff, while saying "Hey Babe"; and

(6) On at least three occasions Head came up behind plaintiff, breathed on her neck, while saying, "[H]ey [B]abe".

(Pl. Br. in Opp. to Def. Mot. for Summ. J. at 5-6 (citing doc. 13, Ex. A at 83, 87, 95, 133-35, 157, 161, 231-32, 263, 267-68, 274).)

Plaintiff alleges that, following the alleged sexual proposals, she had three disputes with Head relating to her job as a Marketing Representative, which she does not include in her list of sexually harassing acts.

In September 2001, plaintiff had a disagreement with Head over the amount of a bonus she had earned for achieving her life insurance sales goal.  (Doc. 13, Ex. A at 184-86 and ex. 13 at Bates no.18-19.)  Apparently, when a Marketing Representative sold a certain

---

and/or rural Southern whites.  A dictionary of African-American slang explains that the term "peckerwood" had its origins in the word "woodpecker." Blacks saw blackbirds as a symbol of themselves and the contrasting redheaded woodpecker as a representation of whites.  Eventually, the word "woodpecker" was inverted to become "peckerwood" in an attempt to hide the meaning and origin of the term.  Later, peckerwood came to be used in the North as well, as a general description for white people.

<<http://www.adl.org/hate_symbols/peckerwood.asp>>

amount of life insurance, he or she would receive a so-called "Life Trip" and spending money. (*Id.* at 167, 169.) Service Representatives were also eligible for Life Trips.

Due to the terrorist attacks on September 11, 2001, the Life Trip for 2001 was cancelled. (*Id.* at 172.) Defendant decided to compensate those employees scheduled for the trip by paying each $2,000, and an additional $1,000 if the employee was scheduled to travel with his or her spouse. (Doc. 13, Ex. E at 104.) Plaintiff was scheduled to travel alone. (Doc. 13, Ex. A at 173-74.) On or about Friday, September 22, 2001, plaintiff received a check for $2,000. (*Id.* at 175 and ex. 16 at 18.) That day, she told Head she believed she should have received $3,000; she testified:

> I told Scott that I had sold my way on this trip and I had sold also for my service rep to go on the trip and that I felt like it wasn't right that my service rep,[7] who didn't have to sell one product, you know, who wasn't accountable for that sale, was paid more than I was just because my spouse couldn't go on the trip.

(*Id.* at 177 (footnote added).)

The decision to award $3,000 to employees traveling with spouses and $2,000 to employees traveling alone was made by defendant's employees at a higher level than Head's management level. (Doc. 13, Ex. E at 104-05.) Head did not participate in the decision to determine the amount of the Life Trip bonuses paid in 2001. (Doc. 13, Ex. F ¶ 7.)

On the following Monday, September 26, 2001, plaintiff again discussed the amount of her bonus with Head. (Doc. 13, Ex. A at 183.) She testified:

---

[7]Plaintiff's Service Representative is Amy Milar, a female. (*Id.* at 68.)

8

And I had my check and I put it on Scott's desk and I said, Scott, I would like
for you to do something about this.

. . .

He said that he couldn't do anything about it.  And so I asked him at
that point, I said, Scott, if you can't do anything about this, who can?  I don't
think this is right.  I sold my way on this trip and I'm being paid less than my
service rep and I just don't think this is right.  So if you can't do anything
about this Scott, who can?  Do I need to call Tommy?
. . .

And at that point, I challenged him on the issue, and he really pretty
much came unglued with me.  He looked at me and said, Are you fucking
stupid?  . . . He said, Don't you ever fucking go over my head.  You'll fucking
lose your job, with his finger pointed in my face as he's screaming at me.

. . .

At that point, I looked at him and I said, You know what, Scott, I'm
done with you, I'm done.  And so I walked out of the office.

(Doc. 13, Ex. A at 183, 185-86.)[8]

Plaintiff testified that she did not "feel like [her] job was in jeopardy" before the

September 26, 2001, incident regarding compensation for the Life Trip, but, after this

---

[8]Plaintiff's notes indicate:

I told Scott that it was very obvious to me that he didn't care about my
perspective on the life trip settlements and that more [than] anything, I was
looking for him to be empathetic about my perspective.  I told him that "he
missed an opportunity to manage".  He quickly told me not to "tell him how
to manage".

(Doc. 13, Ex. A, ex. 13 at Bates no.18.)  She also noted, "I am really disgusted now with the
way that I am being treated," and, "I am very threatened by the sexual remarks and language
that Scott has used with me."  (*Id.* at Bates nos. 18-19.)

incident, she feared Head would cause her to lose her job.  (*Id.* at 140-41, 164-65.)  She

testified that, prior to the Life Trip incident, she had not complained to defendant about

Head's alleged harassing behavior because:

> I had some very specific career goals.  I had a career path that I was trying to
> travel down and that was to be promoted to the next level of account
> executive.  I didn't want anything, including any comments that were made,
> any sexual innuendos, any gestures, anything that would appear to not have me
> fit into the group.  I didn't want anything to get into the way of my being
> promoted.

(*Id.* at 139-40.)  She also testified:

> I was very uncomfortable about the situation, but I thought I have worked in
> this job for three and a half years.  I have an outstanding performance record.
> It will only be a matter of time before a position comes available.  I will be
> able to get out of this situation that I consider to be very unprofessional, very
> immature and just very, very inappropriate.

(*Id.* at 140.)

In October 2001, plaintiff had disputes with two male Marketing Representative over

prospects.  (*See* doc. 13, Ex. A, ex. 16 at 19-20.)

On October 1, 2001, plaintiff and Bob Vought, a male Marketing Representative, had

a dispute over a prospect, AAA Security.  (*Id.* at 205-06 and ex. 13 at Bates no.19.)

Plaintiff's notes regarding this incident state, "Scott [made] a decision regarding AAA

Security (prospect) in Bob's favor even before hearing my side of the story."  (*Id.*, ex. 13 at

Bates no.19.)  Head testified that Vought had told him that "every time he went to [plaintiff]

and/or, from his understanding, when any other marketing rep went to [plaintiff], if the rules

worked in her favor, great, if they didn't, she would attempt to spin it another way so she

could get her claws into it." (Doc. 13, Ex. E at 96-97.) Head testified that he awarded the prospect to Vought based on the prospect sheet. (*Id.* at 97.) Marketing Representatives fill out a prospect sheet in order to protect a prospective customer that they have discovered from other Marketing Representatives. (Doc. 13, Ex. A at 204.) However, plaintiff testified that Head told her, "Bob called on this group a couple of weeks ago or months ago or whatever, and it just didn't get on the prospect list, so it's his prospect." (*Id.* at 206.)

On or around October 29, 2001, plaintiff became aware that Thrasher had circulated a prospect sheet, dated October 26, 2001, for a company called Pro-Food International. (*Id.* at 215-217.) Plaintiff claims that, at this time, she "had a business enrolled call Pro-Foods. (*Id.* at 216.) When she saw Thrasher's prospect sheet, she e-mailed Head for a determination of whether Pro-Foods International was a new prospect. (*Id.* at 217.) After e-mailing Head, plaintiff saw Thrasher and asked to speak to him regarding Pro-Foods. (*Id.* at 218.) Plaintiff alleges that Thrasher screamed at her that "[she] want[ed] the rules to change every time to make sure that they appl[ied] to [her]. (*Id.*) Plaintiff responded that she "didn't make the rules," but Thrasher "continue[d] yelling at [her,] saying that [she] was nothing but a problem to everybody in the office," and that "nobody want[ed] to be around [her and] that's why the office environment is hostile towards [her]." (*Id.*)

When this incident was reported to Head, he spoke with plaintiff and Thrasher separately and later together; he decided that Thrasher would receive the Pro Foods prospect. (*Id.* at 224-29, 241.) Head met with plaintiff and Thrasher and told her that he intended to

11

be fair, consistent and nonjudgmental when assigning projects.  (*Id.* at 226-27.)  Later, Head

met plaintiff and Thrasher.  At this time, plaintiff told Thrasher that she did not "like being

screamed at in the office," and that she did not appreciate the profanity Thrasher had used.

(*Id.* at 241.)  Thrasher testified that plaintiff got upset and started saying she had been

demeaned and "sexually harassed" by many people in the office. (Doc. 13, Ex. K at 76-77.)

Thrasher testified Head told him and plaintiff to "be calm," but that he had to rule in

Thrasher's favor because "we don't sell employees, we sell groups."  (*Id.* at 84.)

Defendant has written policies against sexual harassment.  (Doc. 13, Ex. A at 40, 43

and exs. 5, 6; *id*., Ex. D ¶ 2 and ex. 1.)  Although plaintiff had received training with regard

to reporting alleged sexual harassment, (*see id*., Ex. A at 40-42, 60-62), she did report any

incident of alleged harassment until November 8, 2001, (*id*. at 87.)

On that day, plaintiff reported her complaints of sexual harassment to Emma Barclay,

Compliance Consultant.[9]  (Doc. 13, Ex. E at 28-30; *id*., Ex. H ¶ 3; doc. 15, Ex. 6.)  At that

time, plaintiff gave Barclay "a written synopsis outlining her complaints and/or allegations."

(Doc. 15, Ex. 6; *see* doc. 13, Ex. A, ex.13.)  Plaintiff told Barclay "that she [was] afraid of

losing her job and that her family depend[ed] on her finances."  (Doc. 15, Ex. 6.)  Barclay

told Rick King, Vice President, Human Resources and Compliance Officer, about plaintiff's

---

[9]The Compliance Consultant is responsible for ensuring employees' adherence to
defendant's Code of Conduct and Compliance Program.  (Doc. 13, Ex. N at 15.)

complaints and gave him plaintiff's written synopsis.  (Doc. 13, Ex. D ¶ 1; *id*., Ex. N at 30;

doc. 15, Ex. 6.)

On November 27, 2001, King, Barclay, and Sharon Heaton, Associate Resources

Manager, went from Birmingham to Huntsville to interview Head and other Huntsville

employees about plaintiff's complaints.  (Doc. 13, Ex. A at 259; *id*., Ex. H ¶¶ 1, 3.)  The

interviews took place at the Green Hill Grill, a restaurant near the Huntsville office.  (Doc.

13, Ex. N at 32-33.)  Barclay interviewed Thrasher, King interviewed Head and Bud Smith,

Customer Service Manager,[10] and Heaton interviewed Jodi Rutenberg, Vought's Service

Representative.  (*Id*. at 39; *id*., Ex. C at 52, 74-75.)  Barclay testified that Head was present

in the restaurant during her interview of Thrasher.  (Doc. 13, Ex. N at 34.)  Regarding her

interview with Thrasher, Barclay noted:

> Kirk mentioned [plaintiff's] name almost before the first question was asked.
> His responses seemed rehearsed.  He appeared to be nervous in the beginning.
> Kirk also said that everyone would corroborate his story.  The only exception
> would be Jean Nelson.  He said that [plaintiff] and Jean seem to be friends.  He
> thinks [plaintiff] reminds Jean of her own daughter. [Plaintiff] was the only
> person from the office invited to Jean's daughter's wedding.

(Doc. 13, Ex. N, ex. 2 at 667-68.)

King interviewed Head, who denied almost all the allegations made against him

concerning profanity and sexual harassment.  (*See* doc. 13, Ex. C at 52, 56-68.)  He did not

take notes during his interview of Head, (*id*. at 40, 55), and he never spoke with plaintiff as

---

[10]Doc. 13, Ex. A at 226.

13

part of the investigation, (*id.* at 86-87).  In fact, no one spoke with plaintiff regarding her

complaints of sexual harassment after her initial complaint to Barclay.

King testified that he, Barclay, and Heaton arrived in Huntsville between 9:30 and

10:00 a.m., and that they left "midafternoon."  (*Id.* at 74.)  He also testified that he, Barclay,

and Heaton "compared notes" and "went over most of the issues one by one.  And during that

two-hour ride home, preliminarily [concluded] that there was no merit to [plaintiff's] charges

or the contentions that [she] was making."  (*Id.* at 77.)  Barclay, however,  testified that she

did not recall King discussing anything about his interview with Head during the drive back

to Birmingham.  (Doc. 13, Ex. N at 74.)

On November 29, 2001, plaintiff went to Hudgins's office in Birmingham.  (Doc. 13,

Ex. A at 259-60.)  Hudgins asked plaintiff, "Why didn't you come to me first?"  (*Id.* at 260)

Plaintiff told him that she thought that she was supposed to bring her complaint to Human

Resources.  (*Id.*)  Hudgins told plaintiff to meet with King, which plaintiff did.  (*Id.* at 262.)

At their meeting, King asked plaintiff what she thought should happen as a result of

her complaints, and plaintiff told King she thought Head should be fired.  (*Id.* at 288.)

Plaintiff's notes of the meeting state:

> Rick tells me that on Tuesday, he Sharon Heaton and Emma Barclay [met]
> with Scott, Jodi and Kirk..  He said that no one [corroborates] my complaint.
> Rick and I follow in a lengthy discussion.  I tell Rick that there were no
> witnesses to Scott's advances to me; however, the vocabulary that is used in
> the office is "standard talk".  Rick and I discuss in detail the circus like
> conditions in the District Office.  He said that he understands the behavior in
> the District to be what I described.  I tell Rick, "With God as my witness, I am
> telling the truth and that there are serious issues with Scott's behavior.  I also

tell Rick that I am willing to take a lie detector test to prove that I am telling the truth. I tell Rick that after the compliance meeting that occurred a few months ago in the Huntsville District, "it was all thought to be a big joke." Rick state[d], "I don't know why the folks in Marketing don't take this stuff seriously." . . . He further stated that "Kirk is very immature." Rick ask[ed] me what I would like to happen. I tell Rick that I think Scott should be fired. I then state[d] that I would really hate for anyone to lose their job, but that *I [knew] that I could not work for Scott*. Rick and I continue[d] the discussion and he ask[ed] me if I would be willing for the Company to work with Scott to "mold and shape his behavior." I told Rick that I was not interested in being any part of that experiment." I also discussed with Rick [the] fact that I was in Management with our company for 5 years and didn't know where in our training manual it stated that management could address company associates in the manner in which Scott had addressed me. Rick ask[ed] me to think the situation over during the weekend and to get back with him the following week to see if there is anything that I could come up with.

(Doc. 13, Ex. A, ex. 13 at Bates nos. 21-22 (emphasis added); *see also* Ex. A at 288-90.)

With regard to the so-called "experiment" to "mold and shape Scott's behavior", King

stated:

I told [plaintiff] that we did not have sufficient evidence upon which to base [terminating Head], but we would enlist the aid of an outside counselor to monitor the relationship between her and Head to attempt to assure that no future work place problems or disputes would be encountered. I had in mind Dr. Buddy Seay who had been retained by [defendant] to monitor similar cases of employee conflict and had done so successfully.

(Doc. 13, Ex. D ¶ 6.) Plaintiff testified that she was reluctant to participate in the

"experiment" to "mold and shape Scott's behavior" because –

I had been threatened by Scott. I had been intimidated by Scott. I had been verbally abused and sexually propositioned by Scott, and that was not anything that I thought that I should have to be a part of, them working with him. I felt like the company should have done that prior to offering him a promotional opportunity to manager.

(Doc. 13, Ex. A at 290.)

On December 5, 2001, plaintiff received a phone message from Hudgins, who told plaintiff that he wanted to meet with her on December 7, 2001. (*Id.* at 293.) Plaintiff's notes regarding the December 7, 2001, meeting, state, "[Hudgins began] the meeting by saying, 'You've had some time to think, what do you want to do?' I respond[ed] by saying, '***I can't work for Scott***.'" (Doc. 13, Ex. A, ex. 13 at Bates no. 22 (emphasis added).) Hudgins offered plaintiff a transfer to the Birmingham office, which she declined. (Doc. 13, Ex. A at 293-94.) Plaintiff testified that she declined the transfer to Birmingham because she had an established book of business in Huntsville, and her family, friends, and church were in Huntsville. (*Id.*; *see also* doc. 13, Ex. A, ex. 13 at Bates no. 22.) Hudgins told plaintiff that her complaints had been investigated and that they were uncorroborated. (*Id.* at 295.) According to plaintiff, Hudgins told her, "Scott is the manager. I support him. He will be here for a very long time. You brought charges, [and] they're not [corroborated]. It's over. I can't have strife in the office." (Doc. 13, Ex. A, ex. 13 at Bates no. 22; *see also* doc. 13, Ex. A at 295.)

After she left work that day, plaintiff received a telephone call from Hudgins, who told her that he wanted to meet with her at 10:00 a.m. on Monday, December 10, 2001. (Doc. 13, Ex. A at 298.) At that December 10, 2001, meeting, Hudgins offered again to transfer plaintiff to Birmingham or to allow her to go back to work for Head in Huntsville. (Doc. 13, Ex. I at 76-77; *see also id.*, Ex. A at 300.) Plaintiff again refused to accept either

16

option; Hudgins then placed her on paid administrative leave and instructed her to cease

doing company business.  (Doc. 13, Ex. A at 300 and ex. 13 at 22; *id*., Ex. I at 77; *id*., Ex. D

¶ 7.)

Plaintiff spoke with King on December 14, 2001.  (Doc. 13, Ex. D ¶ 7.)  She told him

that "she would not work for Mr. Head in Huntsville and would not transfer to Birmingham.

(*Id.*)  On December 15, 2001, plaintiff received a letter from King, dated December 14, 2001.

(Doc. 13, Ex. A at 306 and ex. 14.)  This letter states:

> As you know, we take any allegations regarding sexual harassment seriously, and over the last several weeks have devoted substantial resources [to] investigating your complaint.  I have been assisted by Emma Barclay, and others as we questioned a number of associates in the Huntsville Office. While you have re-stated your position quite often, we have not been able to substantiate any of the issues you have raised that you claim constitutes the basis of a hostile environment sexual harassment claim.
>
> We suggested that you and Scott Head find a way to resolve the matters that have put a strain on this relationship and have offered our assistance in this regard.  However, ***you have insisted that you would not continue to work for Mr. Head*** and that it was our responsibility to resolve all of the issues you raise to your satisfaction.  It was our clear understanding that you were not willing to assume any responsibility for the deterioration in your relationship with Mr. Head.  On December 10, 2001, Tommy Hudgins extended to you an opportunity to transfer to the Birmingham District Office as a Marketing Representative and you declined the offer.
>
> ***Your refusal to continue to work in the Huntsville office or consider a transfer to the Birmingham district leaves us with few options***.  The company has thoroughly investigated your allegations, found no reason to take action of any type, and exceeded our obligation to offering alternative employment. You have dismissed any effort on our part to continue what has been a fruitful career.

17

> *We have no choice by to request your resignation by Thursday, December 20, 2001, or in the absence of your tendered resignation, to terminate your employment on the same date*.
>
> In recognition of your service to the company as a manager and an exempt professional, we are prepared to offer a three month severance arrangement. As you may know, this exceeds severance which would be available to exempt professionals.  If we do not hear from you by December 20, you will receive notice of termination.

(Doc. 13, Ex. A, ex. 14 (emphasis added).)

King testified that he believed plaintiff had *refused* to work for Head "[b]ecause [he] was told by Mr. Head that she would not come into the office and she also indicated to [King] that she would not work for [Head] anymore." (Doc. 13, Ex. C at 112.)  However, Head testified that he did not recall plaintiff ever saying that she would not come to work since he had been the manager and that she had never refused to report to him directly.  (Doc. 13, Ex. E at 10.)  He also testified that he did not remember King talking to him about getting counseling.  (*Id.* at 63.)

On December 19, 2001, plaintiff spoke with Milar and told her that she "would not be back." (Doc. 13, Ex. B at 457, 459.)  Plaintiff testified, "I wasn't going to put up with what I was being asked to do just to keep my job."  (*Id.* at 459.)

On December 20, 2001, plaintiff called King and told him that she was not resigning her position with defendant.  (Doc. 13, Ex. A at 307.)  The following day, Heaton sent plaintiff a letter, which stated in part, "Per your conversation with Rick King on December 20, 2001, you elected not to tender your resignation of employment with [defendant];

18

therefore, we have no choice but to terminate your employment on this same date." (Doc. 13, Ex. A, ex. 16.)

## III. <u>DISCUSSION</u>

## A. SEXUAL HARASSMENT – HOSTILE ENVIRONMENT

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). To establish a claim for hostile or abusive working environment sexual harassment, an employee must show:

> (1) that . . . she belongs to a protected group; (2) that [she] has been subject to unwelcome sexual harassment . . .; (3) that the harassment must have been based on [her] sex . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding [her] employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000)(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)); *see also Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003).

In *Gupta*, the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."

*Gupta*, 212 F.3d at 583 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

"Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at 80-81).  It "does not prohibit all verbal or physical harassment in the workplace, and does not reach genuine, but innocuous, differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."  *Id*. (internal quotations omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788.  The "conduct must be ***extreme*** to amount to a change in the terms and conditions of employment . . . ."  *Faragher*, 524 U.S. at 788 (citing *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th Cir, 1986))(emphasis added).  However –

> Although [the court] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met.  Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party  . . . are not counted."

*Gupta*, 212 F.3d at 583 (internal citations omitted).

Defendant contends, *inter alia*, that plaintiff cannot establish that the harassing conduct at issue was sufficiently severe or pervasive to alter the terms and conditions of

plaintiff's employment.  Plaintiff contends the following acts of harassment by Head created

a work environment that was hostile:

> (1)  Head regularly used the work "fuck" or "fucking" around the office; (2) Head regularly used the word "cocksucker" around the office; (3)  Head regularly used the work "peckerwood" around the office; (4) Head used the terms "motherfucker" and "bullshit" on numerous occasions; (5) Head often referred to women as "sluts", "tramps" and "bitches"; (6) on a couple of occasions, Head approached Baldwin and played with the zipper of his pants[,] saying "hey babe, hey babe"; (7) on at least three occasions Head came up behind [plaintiff] close enough so that she could feel his breath on her neck and said "hey babe"; (8) Head thrust his pelvis towards [plaintiff] so forcefully that she was knocked back on his couch and he then demanded oral sex by saying "hey babe blow me"; (9) Head propositioned [plaintiff] for sex at a BCBS banquet honoring top salespeople; (10) after [plaintiff] declined Head's request for oral sex, Head graphically described how he choked his wife, whom he described as a "fucking bitch", during a fight; (11) Head encouraged sexually inappropriate banter among his subordinates by regularly joking with them about sleeping with each other['s] wives and by making other sex[-]tinged comments about each other's wives; (12) Head created an atmosphere where male employees felt comfortable playing with their penis[es] in front of female employees; and (13) Head used the word "babe" when referring to women incessantly.

(Doc. 19 at 19-20 (footnotes omitted).)[11]

According to plaintiff's evidence, Head requested or suggested sexual favors from her

on two occasions:  July 26, 2001 and around July 30, 2001.  She also alleges that, between

July 26, 2001 and  September 2001, he played with his zipper twice, (doc. 13, Ex. A at 263-

---

[11]Plaintiff does not allege that the incident regarding the Life Trip bonus was harassment, nor does she contend that the disputes regarding the two prospects – AAA Security and Pro Foods International – were harassment.  The court notes that these incidents do not constitute "statements and conduct . . . of a sexual or gender-related nature." *Gupta*, 212 F.3d at 583.  Therefore, such incidents "are not counted" in the determination of whether plaintiff's work environment was hostile or abusive because of sexual harassment. *Id.*

65), and he breathed on her neck three times, (*id*. at 267-68). She does not allege any overtly sexual or gender-related conduct after September 2001. However, she contends that Head continuously called her "Babe" and often referred to all Marketing Representatives, male and female, as "Cocksuckers" and "Peckerwoods."[12] Plaintiff's evidence also shows that Head cursed excessively and repeatedly said "fuck." However, the context of his cursing evinces that he did not use the word "fuck" to indicate a sexual act; rather, the record indicates he used the word as an adjective to create emphasis.[13]

In light of Eleventh Circuit case law, the court finds that these incidents, considering the totality of the circumstances, are not sufficiently "extreme" to have altered plaintiff's work environment or a reasonable person's work environment because of sex. *Compare Hulsey v. Pride Restaurants*, 367 F.3d 1238, 1248 (11th Cir. 2004)(finding harassment was objectively severe and pervasive based on 18 incidents over two and half weeks including the harasser's "direct as well as indirect propositions for sex," "following [plaintiff] into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," and "enlisting the assistance of others to hold her while he attempted to grope her"); *Johnson*, 234 F.3d at 509 (finding harassment was objectively severe and

---

[12]The evidence is undisputed that Head used the terms Peckerwood and Cocksucker in a  non-gender specific manner.

[13]For example, plaintiff has offered evidence that Head used the word "fuck" in the following ways – "That's not the fucking question," (doc. 13, Ex. A at 83); "That fucking bitch wife of mine," (*id*. at 122); "Don't you ever fucking go over my head, (*id*. at 185); "You'll fucking lose your job,"  (*id*.).

pervasive based on "fifteen separate instances of harassment over the course of four months," which included the harasser "giving [plaintiff] unwanted massages, standing so close to [plaintiff] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts") *with Gupta*, 212 F.3d at 584-85 (harassing conduct - including "one occasion [when harasser said], 'You are looking very beautiful,'" frequent telephone calls, isolated "comments about the promiscuity of people from Jamaica as compared to the innocence of people from India," harasser "stared at [plaintiff] twice, touched her ring and bracelet once, and kept asking her to lunch," and harasser "plac[ed] his hand on [plaintiff's] knee once, and . . touch[ed] the hem of her dress once" over six or seven months – was not sufficiently severe or pervasive conduct); *Mendoza*, 195 F.3d at 1247 (harassing conduct –"(1) one instance in which [the harasser] said to [plaintiff,] 'I'm getting fired up'; (2) one occasion in which [the harasser] rubbed his hip against [plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [harasser] made a sniffing sound while looking at [plaintiff's] groin area and one instance of sniffing without looking at her groin; and (4) [harasser's] 'constant' following and staring at [plaintiff] in a 'very obvious fashion'" – not sufficiently severe or pervasive).

Therefore, because the court finds that plaintiff has not established that the alleged sexual harassment was sufficiently severe or pervasive to support a hostile environment

claim, defendant's Motion for Summary Judgment is due to be granted and plaintiff's sexual harassment claim will be dismissed.[14]

## B. RETALIATION

The parties have filed cross-motions for summary judgment as to plaintiff's retaliation claim.

In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish:  (1) a statutorily protected expression;  (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(internal citations and quotations omitted).  "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the

---

[14]The court also agrees with defendant's argument that, even if plaintiff had established a hostile work environment, defendant would be entitled to the affirmative defense set out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  However, because the court finds that plaintiff has not established that the alleged harassment was sufficiently severe and pervasive to support a hostile environment claim, the court pretermits discussion of defendant's argument that the evidence supports an affirmative defense.

employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  *Id.*
(citations omitted).

> To survive summary judgment, the plaintiff must . . . come forward with
> evidence, including the previously produced evidence establishing the prima
> facie case, sufficient to permit a reasonable factfinder to conclude that the
> reasons given by the employer were not the real reasons for the adverse
> employment decision.  To show that the employer's reasons were pretextual,
> the plaintiff must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherences, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder could find them
> unworthy of credence.  If the plaintiff does not proffer sufficient evidence to
> create a genuine issue of material fact regarding whether each of the defendant
> employer's articulated reasons is pretextual, the employer is entitled to
> summary judgment on the plaintiff's claim.

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)(internal quotations and citations
omitted).

Defendant argues that it is entitled to summary judgment on plaintiff's retaliation
claim because (1) plaintiff cannot establish an adverse employment action, (2) plaintiff
cannot establish a causal connection between her protected activity and an adverse
employment action, and (3) plaintiff cannot establish that defendant's articulated reason for
her termination is pretextual.

### 1.  Adverse Employment Action

Plaintiff contends that she was terminated; defendant contends that plaintiff quit or
terminated herself.  The evidence shows that defendant actually terminated plaintiff.

Defendant's letter to plaintiff, dated December 21, 2001, states: "[W]e have no choice
but to ***terminate*** your employment on this same date."  (Doc. 13, Ex. A, ex. 16 (emphasis

added).)  For purposes of deciding the Motions for Summary Judgment as to plaintiff's retaliation claim, this evidence is sufficient to establish that defendant actually terminated plaintiff, which is an adverse employment action.  *See Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004)(citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998)).

## 2. Causal Connection

The Eleventh Circuit Court of Appeals has held that a plaintiff establishes a causal connection, for purposes of establishing a prima facie case of retaliation, if she demonstrates "that the protected activity and the adverse  action were not ***wholly unrelated***."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)(emphasis in original; citations omitted).  The letter from defendant to plaintiff, dated December 14, 2001,[15] is

---

[15]This letter states, in pertinent part –

[W]e take any allegations regarding sexual harassment seriously, and over the last several weeks have devoted substantial resources investigating your complaint. . . .  While you have re-stated your position quite often, we have not been able to substantiate any of the issues you have raised that you claim constitutes the basis of a hostile environment sexual harassment claim.

. . .

. . . The company has thoroughly investigated your allegations, found no reason to take action of any type, and exceeded our obligation by offering alternative employment.  . . .

We have no choice but to request your resignation . . . or in the absence of your tendered resignation, to terminate your employment  . . . .

sufficient to establish that defendant was aware of plaintiff's protected activity, and that such protected activity was not ***wholly unrelated*** to her termination.

### 3. Pretext

Defendant contends that plaintiff was terminated because she refused to work in the Huntsville office and would not accept a transfer to Birmingham. (Def. Br. in Supp. of Mot. for Summ. J. at 30-31 [citing doc. 13, Ex. A, ex. 14].) Plaintiff contends that defendant's articulated reason for her termination is unworthy of credence because she never refused to work with Head and she continued to work with Head until she was suspended.

The record shows that, following its investigation of her claims, defendant told plaintiff it had "not been able to substantiate any of the issues [she had] raised that [she] claim[ed] constitute[d] the basis of a hostile environment sexual harassment claim." (Doc. 13, Ex. A, ex. 14.) In response, plaintiff repeatedly stated that she "could not" work with Head. Indeed, plaintiff's notes of her meeting with King state as follows:

> [King] said that no one [corroborates] my complaint. . . . I tell Rick there were no witnesses to [Head's] advances to me; however, the vocabulary that is used in the office is "standard talk". Rick and I discuss in detail the circus[-]like condition in the District Office. . . . Rick asks me what I would like to happen. I tell Rick that I think Scott should be fired. I then stated that I would really hate for anyone to lose their job, but that I did know that ***I could not work for Scott***. Rick and I continue the discussion and he asks me if I would be willing for the Company to work with Scott to mold and shape his behavior". I told Rick that I was not interested in being any part of that experiment.

---

(Doc. 13, Ex. A, ex. 14 at 24.)

(Doc. 13, Ex. A, ex. 13 at Bates nos. 21-22 (emphasis added).)

She also told Hudgins that she could not work with Head and she would not transfer to Birmingham, to which Hudgins allegedly responded: "Scott is the manager, I support him. He will be here for a very long time.   You [brought] charges, [and] they're not [corroborated].  It's over.  I can't have strife in the office."  (*Id.* at 22.)  Plaintiff's notes also indicate that three days following this meeting with Hudgins, on December 10, 2001, Hudgins placed her on paid administrative leave, and  "again that the company offered [her] a transfer and that [she] was not interested and that [she] stated that [she] could not work with Scott."  (*Id.*)

The Eleventh Circuit has held:

> A plaintiff trying to show pretext based on a defendant's dishonest belief of the grounds the defendant gave for his decision does not succeed by presenting evidence that the defendant was mistaken about the facts upon which he based his alleged non-discriminatory decision.  Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he allegedly based his non-discriminatory decision.

*Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002)(citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1260 (11th Cir. 2001)).

Plaintiff told King and Hudgins that she "could not work with" Head.  In her deposition, she testified:

> Q:  You just told them that you weren't going to transfer and you weren't going to work for Head under any circumstances; is that fair?

. . .

A:  I told them that I could not work for Scott.  I did not say under any circumstances.  . . .

Q:  Well, they offered to allow you to work for Scott under some special circumstances, did they not?

. . .

A:  They told me they would work with Scott to mold and shape his behavior.

And I told Rick King that I was not interested in being part of that experiment.

(Doc. 13, Ex. A at 341-42.)

Nothing in the record indicates that King and Hudgins did not, and could not, reasonably interpret plaintiff's statements that she "could not work with" Head as a "refusal" to work with Head.

While plaintiff may be able to convince a jury that King and Hudgins misinterpreted her statements that "she could not work" for Head as a refusal to continue to work with Head, she has not produced any evidence upon which a reasonable jury could find that King and Hudgins did not decide to terminate her based on such misunderstanding.  *Woodard*, 298 F.3d at 1265.  In other words, plaintiff had not produced substantial evidence upon which a jury could find that defendant's articulated reason for her termination is unworthy of credence and that the real reason was retaliation for filing a complaint of sexual harassment.

29

Therefore, based on the foregoing, the court finds that defendant is entitled to judgment as a matter of law as to plaintiff's retaliation claim. Defendant's Motion for Summary Judgment as to plaintiff's retaliation is due to be granted and plaintiff's Motion for Partial Summary Judgment is due to be denied.

## C. INVASION OF PRIVACY

Plaintiff asserts a tort claim under Alabama law for invasion of privacy. In the context of sexual harassment, the tort of invasion of privacy falls into the category of an intrusion into the plaintiff's solitude or seclusion. *See Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708-712 (Ala. 1983). The Alabama Supreme Court has held:

> The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objections in entering his home. It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires. It may be by some ***other form*** of investigation or ***examination*** into his private concerns . . . .

*Hogin v. Cottingham*, 533 So.2d 525, 528 (Ala. 1988)(*quoting Phillips*, 435 So. 2d at 710-11)(emphasis in *Phillips*).

In *Phillips*, the Alabama Supreme Court found that intrusive and coercive sexual demands or inquiries may constitute an invasive examination into "private concerns." *Id.* at 711.[16] Subsequent cases instruct that "[t]here must be something in the nature of ***prying*** or

---

[16]In *Phillips,* the plaintiff's supervisor called her into his office on numerous occasions, locked the door, covered the windows, and questioned her about her sexual

*intrusion* and the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is an intrusion or prying must be, and be entitled to be, private." *See Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988) (citations and quotations omitted; emphasis added). Further, the Alabama Supreme Court has "defined the tort as the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *See McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986). Courts have repeatedly held that the conduct must be ***extreme*** to constitute a tort of invasion of privacy under Alabama law. *Compare Portera v. Winn Dixie of Montgomery,* 996 F. Supp. 1418, 1422, 1435-36 (M.D. Ala. 1998) *with McIsaac*, 495 So. 2d at 651.

The incidents in this case are not sufficiently extreme or intrusive to constitute an actionable claim for invasion of privacy. *See McIsaac*, 495 So. 2d at 651. There is no allegation that Head pried or intruded into plaintiff's private affairs, nor is there any allegation that he touched her in an inappropriate manner. *Compare Portera*, 996 F. Supp. at 1422, 1435-36 *with Kelley v. Worley*, 29 F. Supp. 2d 1304, 1308, 1311 (M.D. Ala. 1998). The allegations of Head's sexual harassment of plaintiff fall short of that required to

---

relationship with her husband. *See Phillips*, 435 So. 2d at 707. On many occasions he inquired as to sexual positions and asked whether they engaged in oral sex. *Id.* Plaintiff's supervisor invited the plaintiff to have a drink, and threatened her job if she did not engage in oral sex with him. *Id.* Plaintiff's supervisor further asked the plaintiff if she was going to "show gratitude" to him by engaging in certain sexual acts. *Id.* The Alabama Supreme Court found this severely intrusive conduct was sufficient to support an invasion of privacy claim.

constitute an invasion of privacy claim.  Thus, defendant is entitled to judgment as a matter of law as to this claim.

## D.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant contends that plaintiff's allegations of harassment are insufficient to support a claim for intentional infliction of emotional distress.  "In Alabama, the tort of outrage only applies 'in the most egregious circumstances.'  The conduct complained of must be 'so outrageous as to be regarded as atrocious and utterly intolerable in a civilized society.'"  *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 755 (11th Cir. 1996)(quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993); *American Rd. Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1981)).

"The initial determination as to whether a statement or action is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is for the trial court to make **as a matter of law**."  *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1509 (M.D. Ala. 1994)(citing *Grimsley v. Guccione*, 703 F. Supp. 903, 907 (M.D. Ala.1988))(emphasis added).  The Supreme Court of Alabama has consistently held that the tort of outrage or intentional infliction of emotional distress only applies "in the most egregious circumstances."  *Thomas v. BSE Industrial Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993).  That court has also held:

> [M]ere insults, indignations, threats, annoyances, petty oppressions, or other trivialities [do not constitute outrageous conduct].  The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain

32

amount of rough language and to occasional acts that are definitely inconsiderate and unkind.

*Surrency v. Harbison*, 489 So.2d 1097, 1105-06 (Ala.1986)(internal quotation marks omitted).  This court has held that, under Alabama law –

> [m]ere requests for sexual favors are not sufficient [to support a claim of outrage].  Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient.  However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties.  An employee can decline even the most obscene request to be touched in a sexual manner.  An employee cannot decline a physical act that has already occurred.  At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society.

*Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 936 (N.D. Ala. 1996)(Propst, J.)(internal citations omitted).

Viewing the facts of the complaint in the light most favorable to plaintiff, this court holds that the facts alleged by plaintiff, as a matter of law, do not support a finding of intentional infliction of emotional distress.  *See Brogdon v. Alabama Dept. of Economic and Community Affairs*, 864 F. Supp. 1161, 1167-1168 (M.D. Ala. 1994); *Mooney v. Henderson and Walton Women's Center-East, Inc.*, 684 So.2d 1340, 1343-44 (Ala. Civ. App. 1996).

## E.  NEGLIGENT TRAINING AND SUPERVISION OR RETENTION

Plaintiff alleges that defendant failed to properly train Head regarding its anti-sexual harassment policies and anti-retaliation policies.  She also contends that defendant failed to terminate Head after it received notice of his harassment of plaintiff.

33

"A party alleging negligent or wanton [training, retention, and] supervision . . must . . . prove the underlying wrongful conduct of employees." *Voyager Ins. Companies v. Whitson*, 867 So.2d 1065, 1073 (Ala. 2003)(citing *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820 (Ala. 1999)).  In other words, the Alabama Supreme Court has held that a defendant-employer "could not be independently guilty of negligence or wantonness in training or supervising [its employee] in the absence of some tort committed by him against [the plaintiff]. *Taylor v. Stevenson*, 820 So.2d 810, 812 (Ala. 2001).

For the reasons set forth above, the court finds that plaintiff has not established that Head committed any tort against her.  Therefore, defendant is entitled to summary judgment as to plaintiff's claims of negligent/malicious training, retention, and/or supervision of Head.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment and denying plaintiff's Motion for Partial Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 12th day of September, 2005.

*Sharon Lovelace Blackburn*

SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

34